The case we're going to hear is Sharma v. USA International, and Mr. Peterson. Thank you, Your Honor. Good morning, Your Honor. May it please the Court. Chap Peterson on behalf of the appellant Jay Sharma in Haymarket Fast Foods. This case comes on our appeal from a decision that was rendered by the Eastern District of Virginia on summary judgment. The case originally arises from the sale of a business in Prince William County, Virginia. It was the sale of two fast food restaurants that were at a Walmart and a strip mall in Gainesville, Virginia. The sale was completed on October of 2013. Once my client closed on the business... Yes, sir. Tell me how to get around Patel. I don't understand Patel. You know what? But how would you have us get around him? Sure. And I've actually read Patel about ten times. You do? And I've thought about how to... And just for background, Patel was the purchase of a ground lease in Hampton, Virginia from the FDIC. And the actual circumstances of purchasing the ground lease, the court went into great detail as to the fraud and some of the attorney malpractice that occurred. But then there was a decision made after a trial in Patel, and I apologize for going into the detail, but the detail is important, in which the jury both gave compensatory damage and punitive damages. And the compensatory damages was partly based on the decrease in what had been bargained for and what had been delivered from the ground lease and also partly on transactional costs. And Patel, they don't really go into what the evidence that was given as to the valuation of that ground lease. They simply talk about it was purchased for $900,000 and then competing bids that were apparently made for that ground lease. There was no detail given. And it's different from this situation in that my client bought two businesses. He began operating those businesses immediately. And they're retail businesses. You actually stand there and run the cash register, and you can see the tape. You can see the sales in real time. So he was able in real time to compare what he was getting in terms of transactions compared to what had been represented to him through the profit and loss statements. In Patel, you had two doctors from Martinsville, Virginia that basically formed an LLC and then bought this ground lease. There was no evidence that they ever actually even traveled to Hampton, Virginia. I mean, Martinsville and Hampton, Virginia are about 180 miles separate. There was no evidence that they had any firsthand experience with the ground lease, any firsthand knowledge with it. And, again, it's hard to parse out the evidence that was actually provided. But this is one of the great discrepancies between this case and Patel is Patel was actually tried. This case was never tried. And the court said in this case, well, your evidence doesn't rise to the level that could show what damages may be in a fraud case. But, again, we never had the answer to put on evidence. I mean, my client had his deposition taken. We had interrogatory answers. You know, I'm sort of one of the probably most important ways of valuing a business is capitalizing earnings. Yes, sir. And they used a capitalization number of 36 here in their discussions of earnings, weekly earnings. Yes, sir. They'd be my client. Yes. Yes, sir. And they both seem to agree, not to disagree with that's the way the street evaluates these services, but that's the typical way a business is evaluated on a capitalization of earnings. Yes, sir. And that was the multiple that both sides used. And the debate on the negotiations was over what were the weekly earnings. Yes, sir. And the negotiations, they had them in there. Then they had them at this amount. And then after there was some satisfaction as to what the weekly earnings were, they were taken out of the deal. But the evaluation still was I bought on the basis of 36 times weekly earnings. Yes, sir. 7,000, 10,000, 15,000, whatever it was a week. And it turned out that not the 36 number was wrong. That's a capitalization number that's used in that business, but the earnings number. Yes. And it seems to me a jury could conclude from that a differential on market value based on capitalization. Yes. Isn't that really?  I agree with you. I don't know what else to say. I thought the other side used the 36 number in the discussions, too. They actually raised the 36 number. Ironically, Judge, I don't want to talk too much because it seems like we're on the same wavelength. Well, you may not have everybody, but I'm saying where are the summary judgment states? Yes, sir. And that is evidence of actual damage on a market basis. The only other thing I was going to add, Judge, is my client actually had used an EBIT, which was a 48-month amortization of the purchase price, where he actually looked at an earnings before income tax and depreciation, which I believe worked on a 48-month multiple and had a $7,000. That was a different calculation. Right. But the 36 week was one both parties discussed. They both agreed. And when we saw the actual earnings on what was actual as composed of the representative P&Ls, there was a discrepancy in that. There's evidence of manipulation by the partner. Yes, sir. And that's not an issue. The court didn't decide any of the fraud questions. It just said there's no evidence of damage. Yes, sir. And that was what they found. And my only observation, if counsel for the opposing side showed up, I'd be asking him that the capitalization method is probably one of the most common methods for evaluating businesses. And that's what they discussed in this case. It wasn't the value of the assets or the value of the equipment or the market value as to what they buy and sell. Right. It was a capitalization. Yes, sir. And I agree. Your Honor, I agree. The only other thing I was going to add about Patel was Patel, they also had transactional costs that the court actually sustained in the opinion. And then there was a punitive damage award, which the court sustained. And, again, since we never proceeded to trial, we also had transactional costs as well as a request for punitives, but we never had a chance to put on that evidence. Where in the record did the defendants use that number, 36? What happened was, Your Honor, is that when the parties negotiated over the original contract, and this was in my client's deposition, which was part of the record, they used the multiple of 36 times weekly sales. And there was a question of what are the weekly sales. It was represented in the complaint as $70,000 a month, but they actually looked specifically at the weekly sales. And that's where they first got the 720 number, and then that was later reduced. I think Judge Wynn's question is where did the opposing party use 36 or accept 36. Where is that in the record, accepting that multiple? I don't know if they accepted it per se. I believe it's my client. They did. Okay. And maybe they did. I think the way it worked out in the summary. I couldn't find it where it did, and I was hoping too bad the other side is not here. Right. You represent they did, and I wanted to know where is it that they came up with this multiple here. All right. Your Honor, I'm going to just, again, it was one of the, in the sum to the interrogatory answers that we filed with the court, that was one of the valuation criteria we used. Let me ask the question. Yes, sir. Because I think Judge Niemeyer hits on this. Whenever you have a fraud case like this, you can prove every element except damage. And what seems to be confusing here is, you know, we're dealing with a summary judgment is one thing, but damages in the case law, you've got to prove damage. The question is do you have to prove the amount of the damage or that there is any damage? Because it seems to me in fraud cases present that phenomenon in some kind of a way. If you've got to prove the actual amount of the damage, then you've got to have a basis upon which to do so. Yes, sir. What is the formula for damage? Is it the value the business had before the representations were, had the misrepresentation been true? Is that the first number you're looking at? Right. There were two parts to it. And the district court accepted the contract price. The district court, they assumed that the bargain for price was the $600,000, and they assumed that that was correct. And I think Virginia law sustains that. Also, could the contract price exist, going back to Judge Trachula's question under Patel, where the contract price of $900,000 was insufficient to be of value. Why would $600,000 here be a representation that this was the business's value had the misrepresentations been true? All right. And Judge Wynn, I think a couple things. I specifically said that $900,000 was not the right price for the virtues of ground lease. He just said there was no evidence of it. And remember that $900,000 was a price where they bought it from FDIC in what very well could have been a distress sale. And, again, the record doesn't give us, at least from the opinion, the complete facts. Our evidence here was you had an arms-length transaction that was negotiated for months between two commercial parties, both of whom, at least on their face, appeared to be sophisticated. So you had a negotiated arms-length transaction. In Patel, again, it looked like it was a little bit of a fire sale from the FDIC. So I don't think the court presumptively said $900,000 was wrong. They just said there was no evidence on the record saying, bang, you can look at the sale price and automatically assume that. We didn't assume that. What we said, the sale price was negotiated between sophisticated commercial parties at arms length, and that's why we felt like that was the correct baseline. And the court agreed. Where the court disagreed was how we came up with that. It assumed that would be a fact. Yes. And the trial court agreed. The trial court agreed with that. So that part's really not up for discussion. The trial court assumed the $600,000. I disagree. I think they did a little bit more than assume. I think they also looked at the fact that this was a months-long negotiation. In fact, the original price had been $720,000, and then had been taken down to $600,000 upon negotiation and upon some further scrubbing of the financial limit. $720,000 was based on 36 times the represented earnings. And then the earnings had gone down. And checkers then said that's too much, and they negotiated it down. Right. That was the underlying assumption. Right. And then the negotiations over the whole period focused on the income per week of that place. Yes, sir. And so that the damage then follows because you have a market value of 36 times earnings agreed to negotiated. Yes, sir. And then when the actual weekly earnings are demonstrated, you have a 36 times earnings, and you have a damage, and that's what the computation that you submitted in the affidavit, right? Yes, sir, and that was the delta. And the actual earnings at the time of the contract? Well, that's the question there, Judge Witt, and that was one of the discrepancies that the trial court pointed out. How do you determine those? Well, that's the thing. You'd have to go back and literally pull the bank records, or you'd have to go back and bring back all the customers. It's impossible. What you do here will show the actual value. Here's what we did. We had a new owner who had the same workforce. I don't think you're understanding his question. What evidence was there of the represented value of weekly earnings? There was a tape. Yes, sir. I mean, the actual documents from the business showed 70,000 were cooked. Right, yes, and we had the tape. We had the actual bank deposits. That's what showed the actual earnings. And then here was the critical evidence, and the one that really turned this case around, or at least turned my client on to the fraud, was that he actually went to the food vendors and said, Why are the numbers lower? Why are my sales numbers lower than the P&Ls that I got during the negotiation? And they said, It shouldn't be. Your food sales are the exact same as what we've been ordering, what we've been delivering all along. Same number of buns, chicken patties, french fries, milkshake mix, whatever it is. It's the same. And then the numbers were put in the preliminary agreement that they had to reach certain levels. Right. And those numbers were cooked. Yes, sir. But they were actually supported by tapes from the business. Yes, sir, and the tapes were fraudulent. That was the point. That's all the evidence of it. That's no finding yet. Right, right. If we had gone to trial and we had the deposition of at least one employee that they had run up fake transactions, so the tape that went to the accountant actually showed transactions which never occurred, but no food was actually changing hands with customers, and no actual money was being deposited in the bank accounts. And so that, again, accounts for the discrepancy. You sure have an advantage here. The other side is not on the other side of that tape. It's not an agreement from this point of view. I know. I'm not so sure it would be so clear-cut if they were here. Yes, sir, and I'm not quite sure why that is, and I'm happy to answer questions. I mean, again, this was a case where, frankly, I think a case should have been tried. We didn't get a day in court. We would like to have a day in court. This was a case where one thing I wanted to talk a little bit about was Rule 701. I felt like it was appropriate for lay testimony for my client to give value of the transaction and to give value of his observations. As far as I understand it, as Neiman is taking it, that is 36 was used in computing the 720. Yes, sir. Not 600,000. 600,000 is a negotiated price from the 720. That's your contention? Yes. I mean, when checkers came back to us and said they felt like he was paying too much at 720. What was the 48 multiplier about? 48 was the multiplier times EBIT. In other words, the monthly earnings before income tax, which I believe is slightly over 7,000, 7,200, if you multiply that by 48, that gets you to the value of 480,000. And again, excuse me, 360,000. That would have been the lower number. And again, this is how we got to 360,000. It was my client's business plan to basically amortize the value of the business over four years. So if he had purchased it at 360,000, he would have amortized it over four years. But obviously he paid 600,000, so he won't be able to do that. I suppose instead of valuing the business, you could even put on damages based on represented sales and actual sales. In other words, if you represent that it's going to be 10,000 a week, you get a business that's only doing, in actuality, 7,000 a week. The differential, at least for those weeks, and you could probably project in a certain period of time in the future, is a loss, is a dollar damage. Right. Your Honor, I think there's many different ways you could have done damages. Obviously, we did. It's all casually done. You guys did it pretty casually, you know, but it's a... Well, Your Honor, I... But we're on summary judgment. Yeah, it was on summary judgment. Again, I didn't have a chance to put them on the witness stand and walk through all the methodologies. It was done through an interrogatory answer, again, adopting the 36-week standard. And again, if you go back to Patel, we could have just put on transactional costs alone, and that should have gotten us past summary judgment. All right. I want to make clear that your opponent had counsel for reasons between counsel and his client. They withdrew and were instructed to supply, hire another attorney to come and argue the case. They've chosen not to, so we're going to take their argument on the briefs. Thank you, sir. And we'll take your argument on the briefs and your argument, unless any one of my colleagues objects, we'll go with that procedure. Thank you, sir. Come down and greet you and adjourn for the day. This honorable court stands adjourned until tomorrow morning at 8.30. God save the United States and this honorable court.
judges: Paul V. Niemeyer, William B. Traxler, Jr., James A. Wynn, Jr.